ROBERT P. BEASLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beasley v. Commissioner
Docket No. 37292-85.
United States Tax Court
T.C. Memo 1989-173; 1989 Tax Ct. Memo LEXIS 176; 57 T.C.M. (CCH) 136; T.C.M. (RIA) 89173; April 17, 1989; As corrected April 17, 1989; As corrected August 17, 1989 Daniel J. McGown and Andrew J. Michaels, for the petitioner.
James V. Moroney and Kathleen L. *177 Midian, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax due to fraud as follows: Fraud Addition
Calendar Year
Deficiency
Sec. 6653(b) [1]
1969
$ 129,675.41
$  65,575.49
1970
79,771.63
41,375.41
1971
335,601.95
169,032.64
1972
170,034.97
85,939.43
1973
21,689.14
11,617.49
After concessions, the issues for decision are: (1) whether petitioner's plea bargain arrangement in a previous criminal prosecution immunizes him from civil tax liability for the years at issue; (2) whether respondent's notice of deficiency is invalid; (3) whether petitioner diverted funds from the Firestone Tire & Rubber Company in the years and amounts determined by respondent, and if so, whether and to what extent such funds constitute unreported taxable income to petitioner; and (4) whether any part *178 of any underpayment of tax for each of the taxable years at issue was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. I. Background
Robert P. Beasley (petitioner) and Emily T. Beasley filed joint Federal income tax returns for the calendar years 1969, 1970, 1971, 1972 and 1973. [2] These returns were prepared using the cash receipts and disbursements method of accounting. At the time the petition in this case was filed, petitioner resided in Akron, Ohio. Petitioner holds an A.B. and a Master's degree in accounting and finance from Vanderbilt University. He was first employed by the Firestone Tire & Rubber Company (Firestone) in 1937. Petitioner was eventually assigned to the Firestone Tax Department in the late 1940's after returning from Naval duty. Petitioner was in charge of the Firestone Tax Department for five or six years during the 1950's. His position at Firestone and interest in Federal tax law led him to attend night *179 law school at the University of Akron, where he received a law degree sometime in the mid-1950's. Petitioner later became a member of the Ohio bar, but never actually practiced law. Petitioner held the following positions at Firestone during the indicated periods: Position
Period
Treasurer
1962 through 1965
Vice President
1965
Vice President, Finance
1966 through 1967
Executive Vice President, Finance
1968 through June, 1975
Director
1966 through May, 1976
In May, 1976, petitioner resigned from Firestone in the wake of an inquiry by the Securities and Exchange Commission (SEC), which commenced in March, 1976. The SEC asked Firestone to report, among other things, whether Firestone funds had been used to make political contributions, and whether any "off-book funds" had been maintained by Firestone. This inquiry was made in response to the disclosure of certain price increases bribes made in Mexico by certain major American tire companies. On March 23, 1976, the Firestone Board of Directors (Firestone Board) directed its Audit Committee to conduct an internal investigation into all matters raised by the SEC. The Audit Committee retained the Chicago *180 law firm of Kirkland & Ellis to act as special counsel. The Audit Committee later authorized the retention by Kirkland & Ellis of Price Waterhouse & Co. to act as special auditors in connection with the investigation. The most serious practice revealed by the investigation was a domestic political contributions program (Program) which had been secretly operated at Firestone for many years. The Program involved the clandestine diversion of Firestone corporate funds off-book, which would eventually be used for political contributions. The contributions were made by reimbursing those participating, including members of Firestone's senior management, for political contributions made as individuals on behalf of Firestone. Cash contributions were also made directly to political fund raisers. This practice was intended to circumvent Federal and State laws which prohibit corporate contributions to political candidates. To remain secret, a vital component of the Program was to avoid the creation of a "paper trail" of documents and records which could be used to prove a link between Firestone and the political contributions. Many members of Firestone's senior management knew of *181 the existence of the Program. However, its operations were kept a secret by giving complete discretion and authority over its management to a single individual. The Program was the responsibility of Elton H. Schulenberg (Mr. Schulenberg), Executive Vice President of Finance, from 1962 until his retirement in January, 1968. During this period, petitioner assisted Mr. Schulenberg in seeking out Firestone funds which could be diverted for use in the Program. Funds obtained from Firestone were converted into cash and kept for later disbursement in a locked box in the Firestone cashier's office vault. Petitioner succeeded Mr. Schulenberg as Executive Vice President of Finance in November, 1968, and assumed responsibility for the Program's operation. After petitioner assumed control over the Program, he became concerned that cash kept on hand in the Firestone cashier's office might be discovered. To alleviate his concern, he made use of off-book bank and custodian securities accounts. During the years at issue, petitioner controlled over 40 such accounts throughout the United States. While these accounts were set up under a variety of names, petitioner retained signature control *182 over virtually all of them. The funds contained in these accounts were not identified as Firestone's, nor did Firestone treat such funds as corporate assets on its books. Petitioner used the off-book accounts to "launder" the diverted Firestone funds. That is, transactions were made in, out and among the various accounts in order to disguise the source of the funds. Petitioner terminated the Program in May of 1973 in the wake of the Watergate Scandal, based on his concern that the illegal activity would be discovered. II. Program-Related Litigation
The Internal Revenue Service (IRS) began an investigation of Firestone shortly after the start of the SEC investigation in March, 1976. Firestone was eventually indicted by a Federal grand jury in Cleveland, Ohio (ClevelandGrand Jury) on a single count of conspiracy, and two counts of filing false corporate income tax returns under section 7206(1) for the taxable years 1972 and 1973. Firestone failed to report funds diverted offbook and certain other amounts as taxable income. Firestone agreed to plead guilty to the two section 7206(1) counts in exchange for the government's dismissal of the conspiracy count. The IRS later *183 issued a 30-day letter with an attached revenue agent's report to Firestone for the taxable years ended October 31, 1966 through October 31, 1971. The revenue agent's report determined, inter alia, that certain gross income items known as the Phoenix AG funds, the Prudential checks and the Firestone-Brazil funds, discussed infra, should have been included in the taxable income of Firestone. The final disposition of the Firestone civil tax case was in accord with this determination. In the case at bar, petitioner admits receipt of the Phoenix AG funds and the Firestone Brazil funds, but denies receipt of any of the Prudential checks. On October 25, 1977, petitioner was indicted by a Federal grand jury in the Southern District of New York (SDNY) on a 40-count indictment involving charges of wire and mail fraud, and the interstate transportation of stolen property. The indictment charged, inter alia, that petitioner assumed control of the Program in November, 1968 and that prior to that time he had been responsible for obtaining corporate funds for the Program. The indictment further charged that petitioner was given complete responsibility and discretion in devising the methods *184 to be used in obtaining Program funds from the Firestone treasury by subterfuge, and then "utilized them to defraud Firestone by obtaining additional corporate moneys without detection for his own personal use." United States v. Robert P. Beasley, 77 Cr. 768 (SDNY 1977), Indictment at par. 3. On February 25, 1978, petitioner pled guilty to four counts of wire fraud (18 U.S.C. section 1343 (1982)) and a single count of interstate transportation of stolen property (18 U.S.C. section 2314 (1982)). All four counts of wire fraud occurred during 1972, in a total approximate amount of $ 28,000. The single count of interstate transportation of stolen property occurred on November 24, 1972, in the amount of $ 60,000. Petitioner's attorney in the criminal case was Peter E. Fleming, Jr. (Attorney Fleming). Attorney Fleming represented petitioner in his plea hearing on February 27, 1978, before Judge Milton Pollack in the United States District Court for the SDNY. In connection with a total of $ 493,158.58 [3] in Firestone funds, Attorney Fleming made the following statement in open court: Between October 1968 and November 1972, for this *185 purpose [i.e. the Program], Mr. Beasley caused approximately $ 493,000 of Firestone moneys to be taken out of Firestone and commingled with personal moneys of Mr. Beasley's in various bank accounts which either already were Mr. Beasley's accounts or which were accounts which he then established and over which he had control. * * * After Firestone's moneys were commingled with personal moneys, Mr. Beasley knowingly used Firestone moneys interchangeably with his own money * * * without Firestone's permission. From time to time he used material portions of the commingled Firestone moneys for payment of personal expenses. * * * Mr. Beasley * * * is prepared to state upon inquiry from Your Honor, one, that he knowingly and wilfully caused the withdrawal and commingling of Firestone moneys * * * and, two, that thereafter, without Firestone's permission, Mr. Beasley *186 did, during that period of time, and from time to time, disburse material portions of these moneys in pay [sic] of personal expenses. * * * [Emphasis added.] Later in the proceeding, Judge Pollack directly addressed petitioner: THE COURT: It has been called to my attention that what you have admitted here is the personal use of the funds and not the withdrawal of the funds as having been without [Firestone's] permission. MR. BEASLEY: Yes, sir. THE COURT: That is correct, is it not? MR. BEASLEY: Yes, that's correct, sir. THE COURT: What I intended to inquire, then, to make it perfectly clear, that without Firestone's permission you used those funds for personal expenses that had reached your hands? MR. BEASLEY: Yes, sir. Attorney Fleming presented to the court an original of the plea agreement reached with the U.S. Attorney's Office in the SDNY. In connection therewith, the following colloquy transpired: MR. FLEMING: * * * Mr. Beasley has received no promises other than the promise of the Department of Justice that Mr. Beasley will not be prosecuted criminally for any matter, including but not limited to personal Federal income taxes arising out of the *187 subject matter of this indictment, or criminally prosecuted in connection with any possible Firestone corporate Federal tax violations. * * * THE COURT: * * * [T]he understanding and agreement and [sic] does not relieve Mr. Beasley of any Federal civil tax liability. MR. FLEMING: That is correct, Your Honor. The letter plea agreement dated February 28, 1978 between the U.S. Attorney and Attorney Fleming expressly provides in paragraph five that "this agreement will not relieve Beasley of any federal civil tax liability." In an April 13, 1979 letter from Assistant U.S. Attorney James C. Lynch to the U.S. Parole Commission, Southeast Region, in Atlanta, Georgia, reference was made to the immunity previously granted petitioner and to petitioner's cooperation in the investigation of Firestone. Petitioner contends that this letter expanded the scope of the immunity previously given. As a result of petitioner's guilty plea, he served sixteen months of a four-year prison sentence at Federal Prison Camp, Eglin Air Force Base, Florida. After commencement of the SEC inquiry and the Audit Committee investigation, petitioner paid over to Firestone the sums of $ 17,210.46 and $ 188,840.71. *188 These amounts represented a return to Firestone of the Phoenix AG and Harvey Firestone funds, plus interest, (discussed infra) which petitioner held in one of his off-book accounts as a custodian, and not for use in the Program. Petitioner voluntarily returned these funds to Firestone without the filing of a lawsuit or the making of any formal claim. In February, 1977, after petitioner's guilty plea and sentencing in his criminal case, Firestone filed an accounting action against petitioner, in order to require him to account for any Firestone funds which may have been appropriated by him. The action was filed in the Court of Common Pleas in Summit County (Akron), Ohio, entitled The Firestone Tire & Rubber Company v. Robert P. Beasley, Case No. 77-2-0514. Petitioner also filed an action in the same court against Firestone and others, entitled Robert P. Beasley v. R. A. Riley, et al., Case No. CV 77-12-2947. In settling these cases, petitioner: (1) forfeited to Firestone deferred compensation consisting of 5,061 shares of Firestone common stock, $ 97,732.90 originally awarded in cash, and $ 26,102.47 in interest and dividends accrued on the stock and cash originally *189 awarded; (2) released Firestone from its obligation to pay petitioner supplemental pension benefits at the rate of $ 168.65 per month (including $ 5,565.45 in such benefits accrued between his retirement in 1976 and the time of the settlement); and (3) paid Firestone $ 65,000 in cash. Firestone estimated the value of the settlement to be at least $ 250,000, and it may have been substantially more. III. Amount of Firestone Funds Diverted Off-Book
A. Agent Lang's Analysis
Gerald J. Lang (Agent Lang) has been a special agent of the Federal Bureau of Investigation since 1974. In December, 1976, Agent Lang was assigned to assist in the investigation of the Firestone Program. The objective of Agent Lang's investigation was to determine the purpose and amount of the funds diverted from Firestone. His investigation led him to analyze over 40 of petitioner's off-book accounts. However, his five-page billboard size charts presented at trial contained an analysis of only 20 bank accounts. A summary of his charts was attached to a report giving his expert opinion, and is set forth in Appendix A hereto. The first half of Agent Lang's summary deals with the sources of funds *190 traced into the 20 analyzed off-book accounts. Agent Lang determined that during the years 1969 through 1973, $ 539,211.79 in Firestone funds were deposited directly into accounts controlled by petitioner. Petitioner admits receipt of these funds in the pleadings. Agent Lang further determined that during the years 1970 through 1973, $ 299,708.33 in cash from unknown sources was deposited into the 20 analyzed accounts, after excluding $ 1,896,646.93 of known or disclosed sources of petitioner's income, including salary, investment income, director's fees and proceeds on the sale of assets. The second half of Agent Lang's summary deals with the uses of funds contained in the 20 analyzed accounts. His analysis provides that $ 2,721,160.47 in funds were traced to personal uses by petitioner, including the purchase of securities, loan repayments, interest expense, and transfers to Swiss banks. Agent Lang was unable to identify, and therefore to schedule, $ 233,367.56 in withdrawals, and admits that these funds could have been used for political contributions. Certain of the bank documents and records relied upon by Agent Lang were illegible at trial, and the respective banks did *191 not preserve such documents and records. Out of the total $ 299,708.33 in "Deposits Classified as Cash Deposits" in Agent Lang's summary, a total of $ 83,708.33 were substantiated only by a deposit slip or account statement, but not both. Deposits of $ 69,078.33 were substantiated by deposit slips, but no account statement, while $ 14,630.00 in deposits were substantiated by account statements, but no deposit slips. B. Respondent's Determination
A 30-day letter with an accompanying report by Revenue Agent Larry Durbin was issued on January 26, 1981, with respect to the taxable years at issue. A protest was then filed in the IRS Appeals Office, but no settlement was reached. Another 30-day letter with an accompanying report by Revenue Agent John Joyce was issued on September 4, 1984 for the same tax years. Once again, an appeal was made resulting in no settlement. The parties stipulated to the materials and information relied upon by Revenue Agents Durbin and Joyce in preparing their reports which were attached to the thirty-day letters sent to petitioner. [4] It was further stipulated that Agent Durbin reviewed and examined, and may have relied upon, documents and data *192 in addition to those specifically stipulated. *193 Respondent issued a notice of deficiency to petitioner on July 8, 1985. The determined deficiency for each year was based upon the Firestone funds which respondent traced, either directly or indirectly, to the possession of petitioner. No reduction was made for any amount of funds used in the Program by petitioner for political contributions or held by petitioner as a custodian. The funds traced by respondent into petitioner's possession fall into three basic categories, as analyzed in Appendix B hereto. The first category (totalling $ 574,203) represents funds the parties stipulate were obtained from Firestone by petitioner. Of such funds, $ 539,212 was directly traced by Agent Lang into petitioner's off-book accounts, and petitioner admits receipt of same. The second category (totalling $ 426,139) represents certain checks drawn by the Prudential Insurance Company (Prudential checks) and made payable to Firestone for the return of premiums and dividends as a result of Firestone's cancellation of certain health insurance contracts. The third category of funds (totalling to $ 92,500) represents other funds that were converted into cash through the Firestone cashier's working *194 fund through the use of Firestone treasury department vouchers (treasury vouchers). The cashier's working fund was an amount of cash kept on hand in the cashier's office, intended to be used primarily for the processing of employee travel advances and personal checks. The funds in the second and third categories were not directly traced to deposits into petitioner's off-book accounts, and petitioner denies receipt of these funds. 1. Treasury Voucher Transactions
Firestone maintained ledger accounts, known as mechanical order (MO) accounts, to accumulate and track costs associated with various legitimate projects. Account No. 98-9749 was a specific MO account adapted by petitioner for use in the Program. Rather than merely accumulating costs, account No. 98-9749 was used as a clearing account for both Program receipts and disbursements. Funds received for the Program would increase the account's balance, while funds spent would decrease it. The corresponding accounting entry to record both receipts and disbursements was to cash. Thus, Program transactions processed through account No. 98-9749 had no affect on Firestone's recorded income, which enabled petitioner to better *195 conceal these activities. Funding for MO account No. 98-9749 was obtained from a modified salary allocation plan at a Firestone Brazilian subsidiary known as Industria De Pneumaticos Firestone S/A (Firestone-Brazil). These funds were not reported as taxable income by Firestone. The use of Firestone-Brazil for this purpose began in September, 1966 and continued through April, 1970. Salary allocation plans had been in effect in a number of Firestone's foreign subsidiaries for many years. The plan allowed management employees residing abroad to elect to have a portion of their salaries paid into U.S. bank accounts. In the case of Firestone-Brazil, the normal salary allocation plan was modified to generate Program funds. Rather than receiving something less than their entire salaries, the employees were paid their full salaries by Firestone-Brazil in Brazilian cruzeiros, and, at the same time, had portions of their salaries paid into U.S. bank accounts. The employees would then rebate to Firestone-Brazil, in cruzeiros, an amount equivalent to the U.S. dollars deposited in their U.S. bank accounts. Thus, Firestone's books showed larger amounts of salaries paid than were actually *196 received by employees because of the rebates. The rebates were used as additional Program funds. Beginning in July, 1967, Firestone employees visiting Brazil exchanged items payable in U.S. dollars, including personal checks, traveler's checks and cash, for cruzeiros. The accumulated dollar items were periodically delivered to petitioner at Firestone headquarters in Akron, Ohio, and deposited into a Firestone corporate bank account. Such deposits resulted in an increase to the balance of MO account 98-9749. Petitioner disbursed Program funds and charged account No. 98-9749 by preparing "treasury vouchers". A treasury voucher is an order to prepare a check drawn on a designated Firestone corporate bank account, and is supposed to be used only in cases when no invoice or other documentary support is available. After checks were drawn, they would either be cashed or deposited into an off-book bank account. Agent Lang directly traced deposits into petitioner's off-book bank accounts of Firestone checks charged to account No. 98-9749, in the amounts of $ 48,375, $ 47,000, $ 42,500 $ 48,250, $ 48,100 and $ 107,777 (See Appendix B). Petitioner admits receiving these funds. However, *197 petitioner denies receiving funds totalling $ 92,500, issued pursuant to treasury vouchers which were not directly traced to specific deposits into one of his off-book bank accounts. On September 22, 1969, September 30, 1969, and September 12, 1972, petitioner prepared treasury vouchers ordering Firestone checks in the amounts of $ 10,000, $ 55,000, and $ 20,000, respectively (See Appendix B). Pursuant to these treasury vouchers, charges were made to account No. 98-9749. On or about November 13, 1972, petitioner received the final installment of Firestone-Brazil funds in the amount of $ 12,967.58. Petitioner directly deposited these funds into an off-book bank account. On April 27, 1973, petitioner prepared a treasury voucher ordering a Firestone check in the amount of $ 7,500. The voucher ordered that a charge be made to MO account No. 98-9709, not account No. 98-9749, which had been normally charged. However, account No. 98-9749 was no longer open in April, 1973 and thus could not accept a charge for disbursed Program funds. 2. Phoenix AG Funds
In 1971, petitioner negotiated the sale of Firestone's stock in Phoenix Gummiwerke AG (Phoenix AG), a foreign corporation, *198 to Munich Reinsurance. The purchase price was DM (Deutsche Mark) 47,686,557.20. In addition to that sum, the terms of sale provided that the Munich Reinsurance was to pay Firestone DM 615,951.36, the equivalent of $ 169,602.00 in U.S. dollars, representing interest which had accrued on the purchase price from the date of the offer to sell (December 10, 1970) to the date of the stock transfer (February 10, 1971). The Deutsch Bank in Hamburg, West Germany, was the transfer agent with respect to the transaction. Petitioner directed the Deutsch Bank to transfer the $ 169,602.00 in interest to one of his off-book accounts on February 11, 1971 (See Appendix B). Petitioner held these funds off-book as a custodian for Firestone, and not for use in the Program. A review of the activity in the off-book bank account into which the Phoenix AG funds were deposited shows that a number of withdrawals and redeposits had been made. The bank account reached a zero balance on May 7, 1976, but was restored to a balance of $ 188,890.71 on June 28, 1976, representing the original amount of the Phoenix AG funds plus interest as calculated by petitioner. He returned this balance to Firestone after *199 the start of the SEC inquiry. 3. Prudential Checks
In the late 1960's, Firestone decided that self-insured employee health insurance would be less costly than its existing insurance contracts with the Prudential Insurance Company (Prudential). Firestone terminated the insurance contracts with Prudential, and established a Voluntary Employee Benefit Association (VEBA) Trust under section 501(c)(9). Accumulated premiums and dividends on the terminated insurance contracts were to be used as a source of funding for the VEBA. Prudential Prudential sent a series of checks payable to Firestone, amounting to a total of $ 2,938,371. Respondent determined that Prudential checks totalling $ 426,139 were converted into cash by petitioner. (See Appendix B). The Prudential checks were sent to the attention of Eldon H. Eaton (Mr. Eaton). Mr. Eaton served under petitioner at Firestone as Treasurer (1966-1970) and Vice President in Charge of Investments (1970-March, 1972). Mr. Eaton reviewed each check from Prudential with petitioner in order to determine the appropriate disposition. Although Mr. Eaton's memory was generally faint, he specifically recollected the events which *200 transpired with respect to two of the Prudential checks. [5] The two checks were dated October 29, 1968 and October 28, 1971, in the amounts of $ 43,827 and $ 182,095, respectively. As to the remaining Prudential checks dated December 15, 1969, September 22, 1970, and January 25, 1971 in the amounts of $ 79,833, $ 72,934 and $ 91,277, respectively, Mr. Eaton had no specific recollection. Since the conversion of the $ 43,827 check occurred in 1968, a year prior to the years at issue in this case, it was not included as a component of respondent's determined deficiencies. Mr. Eaton originally received a check from Prudential in the amount of $ 383,727. Petitioner reviewed this check with Mr. Eaton and directed him to return it to Prudential and request that it be divided and reissued as two checks. Mr. Eaton later received two checks dated October 28, 1971 in the amounts of $ 182,095 and $ 201,632. He reviewed the checks with petitioner and petitioner mentioned to Mr. Eaton *201 that the $ 182,095 check "should provide adequate funds for political contributions for a period of several years, maybe two or three years." At trial, respondent called John B. Welsh (Mr. Welsh), who was assistant controller and director of world-wide auditing for Firestone from 1969 until his retirement in 1984. In 1977 and 1978, Mr. Welsh, together with a team of auditors, investigated the Prudential checks. Stamps on the Prudential checks themselves reflect that they were processed through Firestone. Mr. Welsh concluded that the Prudential checks were not, however, recorded in Firestone's accounting records as assets or as business receipts. Petitioner admits that the cashier's working fund maintained in the Firestone cashier's office was used by him to cash certain Firestone checks generated by treasury vouchers. However, petitioner denies processing the Prudential checks through the cashier's working fund. No record was kept of specific transactions processed through the cashier's working fund. Each day, the Firestone cashier's office prepared a "cash report" that included the total amount of checks cashed through the cashier's working fund. The checks cashed would *202 be deposited into a Firestone bank account. When the level of the cashier's working fund became low, it would be replenished by a Firestone check processed through the use of a treasury voucher. Since the records kept for the cashier's working fund did not enable Mr. Welsh to locate entries for specific transactions, he and his staff performed an analytical review of the daily cash reports. The cashier's working fund was maintained at roughly the same level of funding at all times. However, based upon the daily cash reports on or about the dates each Prudential check was allegedly cashed Mr. Welsh noted an abnormal increase in funding for the cashier's working fund. Mr. Welsh explained that this creates a "presumption" in his view that the Prudential checks were cashed through the use of the cashier's working fund. He expressly denied that there was any direct correlation between an increase in funding and any Prudential check. From November, 1967 to at least November 21, 1978, Roger S. King (Mr. King) was an assistant cashier at Firestone. From 1967 through 1972, Mr. King was supervised by the Head Cashier, Mr. Lewis. Mr. King testified before the Cleveland Grand Jury on *203 November 21, 1978, regarding the investigation of Firestone, and his testimony is treated as live testimony at trial, pursuant to the parties' stipulation. [6]
The $ 43,827 check is the only Prudential check stamped "cashed" on its face. Mr. King did not specifically recall the conversion *204 into cash of this check for petitioner. Mr. King did recollect that on one occasion, in the absence of Mr. Lewis, petitioner submitted a Prudential check to him to be cashed, and that this transaction may or may not have been the $ 43,827 check. Mr. King "guess[ed] that no more than a half a dozen times were such checks cashed for him [i.e., petitioner] over a period of years." Mr. King observed the overall procedure within the cashier's office for cashing checks submitted by petitioner. Petitioner would, except for the single instance above, bring the checks into the cashier's office and give them to Mr. Lewis. Since the checks were large, they would be deposited first, and the cash would be delivered from a Firestone bank by armored car the next day. The cash was always made up of $ 20 bills, and would be set aside for petitioner in large canvas bags in the cashier's office vault. 4. Other Transactions
In 1971, 1972, and 1973, petitioner received a total of $ 11,466.67 in checks payable to Firestone from employees of a Firestone subsidiary in India, representing the repayment of funds advanced to such employees by Firestone (Firestone-India funds). These funds *205 were directly traced to one of petitioner's off-book accounts, and petitioner admits he received them (See Appendix B). In 1972 petitioner received a total of $ 23,524.43 in funds belonging to Firestone-Hispania. These funds were directly traced to one of petitioner's off-book accounts, and petitioner admits their receipt (See Appendix B). During the 1970's ; Firestone had an arrangement to reimburse Harvey S. Firestone (Harvey Firestone) for the "after-tax cost" of securing guard services provided at his residence. The cost of the guard service for 1972 was approximately $ 45,000, and the computed "after-tax cost" to Mr. Firestone was $ 14,140. Harvey Firestone died on June 1, 1973. On the same date, a Firestone check for $ 14,140 was issued to his order. Upon the advice of Harvey Firestone's accountant, petitioner voided the check. Petitioner amended the treasury voucher supporting the check, directing that a new check of equal sum be issued payable to Firestone Bank. The second check was issued on July 23, 1973, endorsed for deposit by petitioner, and was deposited into an off-book account maintained by petitioner at Firestone Bank (Harvey Firestone check). The Harvey *206 Firestone check was directly traced to one of petitioner's off-book accounts by Agent Lang (See Appendix B). Petitioner admits receiving the Harvey Firestone Check, but contends he held it as a custodian and that such funds were not used in the Program. He returned these funds, with interest, to Firestone in response to the SEC inquiry. IV. Amount of Political Contributions
Petitioner made political contributions in two basic ways. First, the more than 20 Program participants made individual contributions and were reimbursed by petitioner in cash. Second, petitioner directly contributed cash to political fund raisers or advanced the cash to a Program participant who did so. Respondent concedes on brief that petitioner directly paid or made reimbursements for political contributions in the following amounts during each respective year: Year
Amount
1969
$ 10,000
1970
5,500
1971
4,300
1972
25,100
1973
12,000
Total
$ 56,900
We accept further receipts and other support offered by petitioner in addition to respondent's concession in the following amounts during each respective year: Year
Amount
1969
$  2,500
1970
20,500
1971
11,000
1972
18,000
1973
-0- Total
$ 52,000
*207 The total of political contributions specifically substantiated during the years at issue thus equals $ 108,900 ($ 56,900 plus $ 52,000), or a total average per year of $ 21,780 ($ 108,900 divided by    5). However, based upon other evidence in the record, we are convinced that the actual total amount of political contributions each year far exceeded this figure. We find that petitioner made payments for political contributions on behalf of Firestone in the following amounts during each respective year: Year
Amount
1969
$ 75,000
1970
75,000
1971
75,000
1972
150,000
1973
25,000
Total
$ 400,000
OPINION Immunity from Civil Tax Liability
Petitioner first contends that he is immune from civil tax liability in this case. As we find this argument to be totally meritless, we dispense with it quickly. At petitioner's guilty plea hearing before Judge Pollack in the SDNY on February 27, 1978, petitioner's counsel, Attorney Fleming, expressly agreed with the court that the plea agreement reached with the U.S. Attorney's Office in the SDNY did not relieve petitioner of any Federal civil tax liability. Paragraph five in the letter plea agreement *208 dated February 28, 1978 between Assistant U.S. Attorney V. Thomas Fryman, Jr. and Attorney Fleming expressly states that "this agreement will not relieve Beasley of any federal civil tax liability." On April 13, 1979, Assistant U.S. Attorney James C. Lynch sent a letter to the U.S. Parole Commission in Atlanta, Georgia, regarding petitioner. Petitioner contends that this letter expanded his immunity to cover civil tax liability. In actuality, this letter merely refers to the immunity granted by virtue of the February 28, 1978 letter plea agreement, and comments regarding petitioner's cooperation in the investigation of Firestone. Accordingly, we hold for respondent on this issue. Notice of Deficiency
The second issue for decision is whether respondent's notice of deficiency issued to petitioner dated July 8, 1985 is invalid. Petitioner first argues that respondent ignored his own procedural rules by issuing 30-day letters nearly four years apart; but petitioner does not point to any specific rule purportedly violated. Regardless, the policies and guidelines set forth in the Internal Revenue Manual are not legally binding on respondent, since they are merely directory *209 and not mandatory. Cleveland Trust Co. v. United States,421 F.2d 475 (6th Cir. 1970), cert. denied 400 U.S. 819 (1970). Accordingly, this argument is without merit. Petitioner next argues that respondent's notice of deficiency was "arbitrary, unreasonable, without foundation and clearly does not represent a good faith attempt by the Commissioner * * * to determine amounts of income actually attributable to Mr. Beasley." Petitioner contends that respondent intentionally "pumped-up" his determined deficiency in order to improve his negotiating position. Specifically, petitioner argues that: (1) the determined deficiency includes Firestone funds not directly traced to deposits into petitioner's off-book bank accounts; and (2) respondent made no allowance in the notice of deficiency for any political contributions or for funds returned to Firestone. Except for fraud, respondent's determinations in his notice of deficiency are presumed to be correct, and petitioner bears the burden of proof and of going forward with the evidence. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). However, a showing by petitioner that respondent's *210 determination is arbitrarily excessive or without foundation has the effect of shifting the burden of going forward with the evidence to respondent. Helvering v. Taylor,293 U.S. 507 (1935). "As a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedures used in making his determinations," since a proceeding in this Court is de novo. Greenberg's Express Inc. v. Commissioner,62 T.C. 324, 327 (1974), citing Human Engineering Institute v. Commissioner,61 T.C. 61, 66 (1973). However, this Court will on rare occasions look behind the notice of deficiency in cases involving unreported illegal income, where the respondent has introduced no substantive evidence but rested on the presumption of correctness and petitioner challenged the notice of deficiency on the grounds that it was arbitrary. Jackson v. Commissioner,73 T.C. 394, 401 (1979). "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative -- that he did not receive the income which the Commissioner *211 claims -- than it imposes upon a taxpayer who is attempting to sustain a deduction." Weir v. Commissioner,283 F.2d 675, 679 (6th Cir. 1960). Respondent's determined deficiencies were based upon the reports of Internal Revenue Agents Durbin and Joyce. Both agents relied upon the materials and information listed in footnote 4, supra. We think it is clear that respondent had more than an adequate foundation for his determination. We also think that the amounts of the determined deficiencies were not arbitrarily excessive. Petitioner makes much of the fact that respondent's determination was based in large part on Firestone funds which were not traced directly to deposits into petitioner's off-book bank accounts. However, respondent relies on other proof to show that those funds not directly deposited were nonetheless diverted off-book by petitioner. Petitioner also takes issue with the fact that respondent's notice of deficiency fails to take into account that petitioner made any payments for political contributions or held Firestone funds as a custodian. Respondent conceded on brief that $ 56,900 in payments for political contributions were made by *212 petitioner during the years at issue. This concession does not render the statutory notice arbitrary. See Commissioner v. Estate of Leyman,344 F.2d 763 (6th Cir. 1965), vacated on other grounds 383 U.S. 832 (1966). We do not expect respondent to guess in his notice of deficiency at the total amount of political contribution payments made by petitioner. Respondent made a reasonable attempt to concede those specific payments which respondent considered to be substantiated. Accordingly, we hold that respondent's statutory notice of deficiency was valid. Unreported Income
The third issue for decision is whether petitioner diverted funds from Firestone in the taxable years and amounts determined by respondent, and if so, whether and to what extent such funds constitute unreported taxable income to petitioner. Petitioner bears the burden of proof on this issue. Welch v. Helvering, supra; Rule 142(a). In deciding this issue, we break our discussion down into three steps: (1) whether respondent's determination of the amount of funds diverted from Firestone by petitioner is correct; (2) how much was actually spent by petitioner *213 on political contributions during the years at issue; and (3) whether and to what extent petitioner has unreported income during the years at issue. Respondent determined that petitioner diverted $ 1,092,842 from Firestone during the years at issue. A detailed analysis of the transactions making up respondent's determination is set forth in Appendix B. Petitioner admits receiving a total of $ 574,203 of Firestone funds during the years at issue. Of these funds, $ 539,212 was directly traced by Agent Lang to petitioner's off-book bank accounts. However, petitioner denies receiving the remaining two categories of funds in the amounts of $ 426,139 and $ 92,500. In addition, Agent Lang was unable to directly trace the transactions making up these total amounts to specific deposits in petitioner's off-book bank accounts. Instead, respondent presents circumstantial evidence and asks us to infer that these amounts were converted into cash by petitioner through the Firestone cashier's working fund. In considering respondent's contention, we begin with the $ 426,139 in Prudential checks. In indirectly tracing the Prudential checks to petitioner, respondent relies primarily *214 upon the following evidence: (1) Agent Lang's analysis (Appendix A) showing unexplained cash deposits to petitioner's off-book accounts in the amount of $ 299,708.33; (2) the testimony of Messrs. Eaton and King; (3) the analysis of Firestone's cashier's office daily cash reports performed by Mr. Welsh; and (4) the fact that the Prudential checks were never recorded as Firestone receipts or included in taxable income, yet were processed through the cashier's working fund while petitioner was Firestone's chief financial officer. Petitioner vigorously disputes the reliability of Agent Lang's analysis and testimony. Agent Lang's analysis includes only 20 of more than 40 off-book bank accounts under the control of petitioner. Agent Lang selected only those accounts for analysis which contained specific deposits traced from Firestone. Also, Agent Lang analyzed only segments of accounts, and not the totality of transactions within each account. An account segment represents Agent Lang's tracing of deposited Firestone funds to their eventual use by petitioner. At trial, Agent Lang testified that the analysis was based upon a "trust account or direct tracing theory." That is, specific *215 items that were traced directly from Firestone, or were determined to be cash deposits, were segmented and traced to their eventual uses. Since only segments within certain bank accounts were analyzed, all of the off-book accounts were not considered as a total pool of funds. This places a question mark on whether the "deposits classified as cash deposits" on Appendix A actually represent sources of taxable income. These deposits could represent (1) non-income items, such as gifts, redeposits, loan proceeds, bank transfers, and amounts earned by petitioner prior to the years at issue; or (2) income items already included in petitioner's taxable income, such as his salary and proceeds from the sale of securities. Further, some of the deposit slips and account statements relied upon by Agent Lang in preparation of his analysis were illegible at trial. Accordingly, the $ 299,708.33 in "deposits classified as cash deposits" on Agent Lang's analysis at Appendix A has limited probative value. Any correlation between the Prudential checks and these bank credits based solely upon Agent Lang's analysis is tenuous. Agent Lang's analysis is, however, only one of many forms of evidence *216 presented by respondent. Since respondent contends that the Prudential checks were converted into cash through the cashier's working fund, it is not crucial that respondent show that these funds were later deposited into an off-book bank account. These funds may well have remained in the form of cash. Mr. Eaton worked under petitioner at Firestone, and specifically recollected discussions with petitioner regarding two Prudential checks. The two checks were dated October 29, 1968 and October 28, 1971, in the amounts of $ 43,827 and $ 182,095, respectively. Petitioner commented to Mr. Eaton about the use of these funds for political contributions. However, since the $ 43,827 check was cashed in 1968, prior to the years at issue in this case, it was not included in respondent's determination. Mr. King was an assistant cashier at Firestone, working under the head cashier, Mr. Lewis. On one occasion, in the absence of Mr. Lewis, Mr. King cashed a Prudential check for petitioner. He also observed the overall process within the cashier's office for cashing petitioner's checks through the cashier's working fund. Mr. Welsh, the assistant controller and director of worldwide auditing *217 for Firestone, and his staff investigated the Prudential checks. The records maintained in the Firestone cashier's office were inadequate to track the conversion into cash by way of the cashier's working fund of each specific Prudential check. Accordingly, Mr. Welsh and his staff performed an analytical review of daily cash reports. Based upon the daily cash reports, Mr. Welsh noted an abnormal increase in funding for the cashier's working fund on or about the dates each Prudential check was cashed. He explained that while this analytical review does not establish a direct correlation between an increase in funding and any Prudential check, it does create a "presumption" that such checks were in fact cashed. We agree. This analytical review procedure performed by Mr. Welsh is highly probative. Finally, the receipt of the Prudential checks was never recorded in the Firestone accounting records. Further, the IRS investigation of Firestone revealed that the diverted Prudential checks represented unreported taxable income to Firestone. However, the Prudential checks themselves indicate that they were processed through a Firestone corporate bank account. The conclusion we draw is *218 that these checks were cashed through the cashier's working fund and taken off-book. We also conclude that petitioner took possession of the cash generated from the Prudential checks. Petitioner was the chief financial officer of Firestone, and had ultimate authority over the disposition of the Prudential checks. We do not believe that petitioner would let the $ 426,139 in Prudential checks remain unaccounted for, unless he himself took possession of such funds. The remaining category of funds, set forth in Appendix B, represents treasury voucher transactions totalling $ 92,500 which were not directly traceable as deposits to petitioner's off-book accounts. Petitioner processed these treasury vouchers in the same manner as those to which he admits receipt. All treasury voucher transactions were processed by charging an MO account and disbursing cash from a Firestone corporate bank account. Petitioner, however, admits only the receipt of cash from treasury voucher transactions which were directly traced into his possession, and denies all others. We find petitioner's denial to be self-serving and unreliable. Accordingly, we conclude that respondent's determination that $ *219 1,092,842 in Firestone funds were diverted off-book by petitioner during the years at issue is correct. We next consider how much petitioner actually spent on political contributions during the years at issue. Respondent concedes on brief that petitioner spent $ 56,900 for political contributions. However, respondent gives petitioner credit only for those contributions for which he can produce a receipt or other documentation and/or the unequivocal testimony of the person receiving such funds. After accepting additional documents and testimony offered by petitioner, we would add to respondent's figure $ 52,000, for a grand total of $ 108,900 in political contributions. However, this approach takes into account only those political contribution transactions which can be specifically substantiated in some manner. Some documentation was obviously retained by petitioner, as it was presented as substantiation in this case. At the same time, the parties stipulated that a vital component of the Program was to avoid the creation of a paper trail of incriminating evidence. Thus, the documentation presented supports only a portion of the actual political contributions made. Further, *220 we do not believe that all recipients of Program funds testified, and we also question the credibility of those that did. Accordingly, we are convinced that the documents and testimony presented represent only a portion of the actual political contribution payments made by petitioner. We do not condone petitioner's conduct in operating the Program, but it offers a plausible explanation as to why complete documents and records are not available to substantiate each contribution. See Liddy v. Commissioner,T.C. Memo. 1985-107, affd. 808 F.2d 312 (4th Cir. 1986). In order to more accurately decide the actual amount spent by petitioner each year, we take into account estimates by Messrs. Schulenberg, Floberg and petitioner of total political contributions each year. However, in approximating the amount of political contributions, we do so "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). Prior to 1968, Mr. Schulenberg administered the Program. Thereafter, he also participated in the Program under petitioner's administration. In his grand jury *221 testimony, he estimated that outside of a presidential election year, annual contributions were about $ 70,000. Political contributions were substantially higher during presidential election years, amounting to about $ 150,000. In a letter dated May 6, 1976, the IRS District Counsel in Cleveland, Ohio, submitted a list of questions to Firestone. John F. Floberg, Firestone Vice President, Secretary and General Counsel, responded to those questions by letter dated June 7, 1976, signed under penalties of perjury. Mr. Floberg answered: "It appears that during the period from November 1, 1971 to the spring of 1973, by which time the Program had been terminated, a total of about $ 250,000 in corporate monies was used to make political contributions." This estimate was based upon, inter alia, the knowledge Mr. Floberg acquired in connection with the special investigation being conducted under the supervision of the Audit Committee of Firestone in 1976. Since $ 250,000 was spent over approximately a 1-1/2 year period, it is the equivalent of $ 166,667 a year ($ 250,000 divided by 1-1/2). Petitioner has also given his own estimate as to the amount of contributions each year. At trial, *222 petitioner reaffirmed an estimate he had given to the Firestone Audit Committee, which he remembered to be approximately $ 130,000 per year. Specifically, the 1976 Audit Committee Report states that petitioner estimated that approximately $ 330,000 in Firestone funds were contributed during "the period under review." The "period under review" was from November 1, 1970 to December 20, 1976. However, the Program was terminated in May, 1973. The period November 1, 1970 to May 1973, inclusive, is a period of 2 years and 7 months. Thus, the average contribution per year during this period was $ 127,742 ($ 330,000 divided by 2-7/12) according to petitioner's estimate to the Audit Committee. We conclude that petitioner made payments for political contributions on behalf of Firestone in the following amounts during each respective year: Year
Amount
1969
$ 75,000
1970
75,000
1971
75,000
1972
150,000
1973
25,000
Total
$ 400,000
In our conclusion, we recognize that 1972 was a presidential election year, and that contributions were approximately twice that of each of the preceding three years. Further, since the Program was terminated in May of 1973 and Program *223 activities were winding down, petitioner made contributions in that year of only approximately one-third that of the other non-presidential election years. Finally, we must decide whether and to what extent petitioner underreported taxable income during the years at issue. Respondent first argues that other members of Firestone's management participated in and thus knew of the Program's existence, but were unaware of the magnitude of funds diverted and the use of off-book bank accounts. Given the great deference and discretion given to petitioner in operating the Program, we think it likely that they did not in fact know. It was, after all, a secret operation. Respondent next argues that petitioner spent a substantial amount of Program funds for personal purposes. Petitioner admits commingling Firestone funds with his own, but claims that for each dollar of Firestone funds that came into his possession, a dollar was either spent for political contributions or returned to Firestone. While we discount the value of Agent Lang's analysis, we nonetheless agree with respondent. Agent Lang's analysis portrays petitioner as having spent $ 2,721,160.47 of Firestone funds for personal *224 purposes, and leaves a mere $ 233,367.56 labeled "unidentified or unscheduled" withdrawals, which he concedes could have been used for political contributions. However, Agent Lang scheduled only segments within about half the off-book accounts used by petitioner. Since all transactions in all accounts were not analyzed, we do not know how much of the total pooled funds was actually used for personal purposes. This gives rise to the possibility that, viewed as an entire pool of funds, non-Firestone receipts could have been equal to or greater than personal expenditures. However, petitioner has not proven this was the case, and we reach our decision herein in spite of the shortcomings of Agent Lang's analysis. It is well settled that a taxpayer who receives monies under a claim of right and without restrictions as to its disposition must include such monies in gross income. North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932). Embezzled funds are included in the gross income of the embezzler in the year in which they are misappropriated. James v. United States,366 U.S. 213, 219-220 (1961). "If, when, and to the extent that the *225 victim recovers back the misappropriated funds, there is of course a reduction in the embezzler's income." James v. United States, supra at 220. However, the mere receipt and possession of money does not by itself constitute gross income. Lashells' Estate v. Commissioner,208 F.2d 430, 435 (6th Cir. 1953). Further, "We accept as sound law the rule that a taxpayer need not treat as [gross] income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." Diamond v. Commissioner,56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974) (citation omitted). The amount of funds which flow through a taxpayer as a conduit are not treated as a deduction, but rather such amounts are not included in gross income. Goodwin v. Commissioner,73 T.C. 215, 231 (1979). Respondent characterizes petitioner as an "embezzler" to the extent that the $ 1,092,842 in funds traced to petitioner exceeds the $ 56,900 respondent concedes petitioner spent on political contributions for Firestone. In contrast, petitioner *226 characterizes himself as a "conduit" to the extent Firestone funds were diverted off-book for Program purposes, and as a "custodian" over the Phoenix AG and Harvey Firestone funds. In this case, however, we find that petitioner defies pure characterization. To the extent we found petitioner spent Firestone funds on political contributions he was a conduit, and such amounts are thus not taxable to him. Further, we are convinced that petitioner held the Phoenix AG and Harvey Firestone funds as a custodian for Firestone, and these amounts are also not taxable to him. We find persuasive that petitioner paid these funds, with interest, back to Firestone after the start of the SEC investigation of Firestone without the filing of a lawsuit or the making of any formal claim. This tells us that others at Firestone knew petitioner was holding these funds for Firestone. Since we accept petitioner's testimony and discount Agent Lang's analysis, we are also convinced that petitioner did not spend these funds for personal purposes, or, to the extent he used and replaced these funds, he treated them as borrowed from Firestone. The fact remains, however, that after deciding the amount spent *227 on political contributions and kept as a custodian, a large amount of Firestone funds diverted by petitioner remains unaccounted for. Petitioner's statement that all Firestone funds were either spent for political contributions or returned is inconsistent with our findings and not credible. Further, we take into account the admissions by petitioner and his counsel, Attorney Fleming, at petitioner's guilty plea hearing before Judge Pollack in the SDNY. Both petitioner and Attorney Fleming admitted to Judge Pollack that $ 493,158.58 of Firestone funds listed in petitioner's indictment had been commingled and used for the payment of personal expenses. A total of $ 355,469.58 of such funds pertains to the taxable years 1969, 1970, 1971, and 1972. [7] Accordingly, we hold that petitioner is taxable on the unaccounted for portion of Firestone funds diverted as embezzlement income, computed as follows: Firestone Funds
Custodial
Political
Unreported
Year
Diverted
Funds
Contributions
Income
1969
$   193,208
$ 75,000
$ 118,208
1970
120,434
75,000
45,434
1971
488,941
$ 169,602
75,000
244,339
1972
263,286
150,000
113,286
1973
26,973
14,140
25,000
(12,167) [8]
Totals
$ 1,092,842
$ 183,742
$ 400,000
$ 509,100
*228 Fraud
The final issue for decision is whether petitioner is liable for the addition to tax due to fraud under section 6653(b) for each of the years at issue. Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. If we find fraud in each of the years before us, the statute of limitations under section 6501 will not bar assessment. Sec. 6501(c)(1). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent will carry his burden if he shows that the taxpayer intended to evade taxes which *229 he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by some affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492, 499 (1974); Stephenson v. Commissioner,79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent *230 intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971). Respondent need not establish that tax evasion was a primary motive of the petitioner, buy may satisfy his burden by showing that a "tax-evasion motive play[ed]any part" in petitioner's conduct, including conduct designed to conceal another crime. Worcester v. Commissioner,370 F.2d 713, 717 (1st Cir. 1966), affg. in part and vacating in part on another issue T.C. Memo. 1965-199, citing Spies v. United States,317 U.S. 492, 499 (1943) (emphasis in original); Recklitis v. Commissioner,91 T.C. 874, 909 (1988). Having considered all of the evidence before us, we hold that petitioner is liable for additions to tax due to fraud under section 6653(b) for the taxable years 1969, 1970, 1971 and 1972. Further, the statute of limitations under section 6501 does not bar assessment and collection by respondent for such years. As to the taxable year 1973, however, we held above that petitioner had no unreported income in such year from the Program. Prior to trial, petitioner conceded liability for deficiencies in 1973 attributable to certain *231 partnership losses of $ 15,542.00, but continued to assert the statute of limitations as a defense. Respondent has not proven that any part of the underpayment attributable to the partnership losses was due to fraud. Accordingly, since respondent has failed to prove that any part of any underpayment in 1973 was due to fraud, the addition to tax under section 6653(b) does not apply to the year 1973. Further, the statute of limitations bars the assessment and collection of tax by respondent for the year 1973. Petitioner was the chief financial officer at Firestone, and was given broad discretion and sole control over the illegal political contributions program. His co-officers were aware that the Program existed, but they deferred completely to petitioner in its operation. Petitioner's subordinates followed his commands without question. Thus, there was no accountability by petitioner for the Program to anyone. This lack of accountability gave petitioner the opportunity to siphon off a portion of the diverted Firestone funds for his own personal purposes. In operating the Program, it was petitioner's task to seek out those Firestone funds which could be converted for use *232 in the Program. Petitioner claims he sought out funds which would be non-taxable to Firestone. In actuality, he sought out funds which bore the least likelihood of detection. The funds generated from the Firestone-Brazil salary diversion plan, the Phoenix AG transaction, and the Prudential checks are clear examples of this motive. The failure of Firestone to report these and other amounts of taxable income culminated in its guilty plea to two counts of filing false corporate returns under section 7206(1). If petitioner was unable to accomplish a direct diversion of Firestone funds into one of his personal accounts, as was the case with the Phoenix AG funds, petitioner would accomplish the diversion in one of two other ways. First, as with the Firestone-Brazil funds, he would deposit the moneys in a Firestone corporate bank account, and record the receipt not as income to Firestone, but as a credit to an MO account. Then, he would draw checks against the MO account through the use of treasury vouchers, which would then be cashed through the Firestone cashier's working fund. Second, as with the Prudential checks, petitioner would bypass the MO accounts and cash the checks directly *233 through the cashier's working fund. Petitioner's sophisticated scheming attests to the fact that he was not acting out of ignorance. He had undergraduate and graduate degrees in accounting and finance. He was also an attorney, with a special interest and expertise in tax law. We find it hard to believe petitioner's testimony that it was his opinion that the funds generated for the Program were nontaxable to Firestone. We find even less credible that after diverting Firestone funds off-book, commingling such funds in his personal accounts, and then using a material portion of the funds for personal purposes, that he did not know the funds were thus taxable to him. The simple truth is that petitioner's scheme did not include getting caught. [9]
To reflect the foregoing, Decision will be entered under Rule 155.
APPENDIX A SUMMARY OF CHARTS PREPARED BY SPECIAL AGENT LANG
SOURCES AND USES OF FUNDS DEPOSITED TO ROBERT P. BEASLEY BANK
ACCOUNTS
Sources of Deposits
Firestone Checks and Moneys
From Brazilian Subsidiary
$   539,211.79
Deposits Classified as Cash Deposits:
Cash Deposits as Shown
By Deposit Tickets
$ 192,238.33 No Detail Deposits
Classified as Cash
Deposits
$  93,950.00 Check Deposits Classified
as from Cash source
$  13,520.00 $   299,708.33
TOTAL:
$   838,920.12
Miscellaneous Deposits
$ 1,896,646.93
Opening Balances
$   347,458.53
TOTAL: $ 3,083,025.58
Uses of Withdrawals
Personal Expenditures:
Purchases of Securities
$ 1,956,340.32
Loan Repayments
$   610,488.65
Interest Payments
$    53,308.18
Other
$    45,823.59
$ 2,665,960.74
Transfers to Swiss Banks
$    55,200.00
TOTAL:  [1] $ 2,721,160.47
Unidentified or Unscheduled
$   233,367.56
Closing Balances
$   128,497.28
TOTAL:  $ 3,083,025.58
*234 APPENDIX B ANALYSIS OF FIRESTONE FUNDS DIVERTED OFF-BOOK BY PETITIONER
(dollars rounded)
Category of Funds Traced
Directly Traced and
Indirectly Traced-
Indirectly
Year-Description
Petitioner Admits
Prudential Checks
Traced-Other
1969:
Treasury Voucher
(TV) No. 651
* + $ 48,375
Prudential Check
(PC)
$ 79,833
TV No. 6659
+ $ 10,000
TV No. 7233
+  55,000
Year's Totals
$ 48,375
$ 79,833
$ 65,000
1970:
TV No. 8153
* + $ 47,500
PC
$ 72,934
Year's Totals
$ 47,500
$ 72,934
1971:
Phoenix AG Funds
* $ 169,602
TV No. 4972
* + 42,500
Firestone India Funds
(FIF)
800
FIF
2,667
PC
$ 91,277
PC
182,095
Year's Totals
$ 215,569
$ 273,372
1972
TV No. 2122
* + $ 48,250
TV No. 4594
* + 48,100
TV No. 6226
* + 107,777
TV No. 5924
+ $ 20,000
Firestone Brazil
Funds
* 12,968
FIF
2,667
Firestone Hispania
Funds (total)
23,524
Year's Totals
$ 243,286
$ 20,000 1973:
TV- Harvey Firestone
Check
* $ 14,140
FIF
2,333
FIF
3,000
TV No. 3208
$ 7,500
Year's Totals
$ 19,473
$ 7,500
TOTALS
$ 574,203
$ 426,139
$ 92,500
*235 Year-Description
TOTALS
1969:
Treasury Voucher
(TV) No. 651
$ 48,375
Prudential Check
(PC)
79,833
TV No. 6659
10,000
TV No. 7233
55,000
Year's Totals
$ 193,208
1970:
TV No. 8153
$  47,500
PC
72,934
Year's Totals
$ 120,434
1971:
Phoenix AG Funds
$ 169,602
TV No. 4972
42,500
Firestone India Funds
(FIF)
800
FIF
2,667
PC
91,277
PC
182,095
Year's Totals
$ 488,941
1972
TV No. 2122
$ 48,250
TV No. 4594
48,100
TV No. 6226
107,777
TV No. 5924
20,000
Firestone Brazil
Funds
12,968
FIF
2,667
Firestone Hispania
Funds (total)
23,524
Year's Totals
$ 263,286
1973:
TV- Harvey Firestone
Check
14,140
FIF
2,333
FIF
3,000
TV No. 3208
7,500
Year's Totals
$ 26,973
TOTALS
$ 1,092,842
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent determined deficiencies and additions to tax due to fraud only against Robert P. Beasley.↩
3. Specifically, the indictment refers to the following transaction dates and amounts: ↩
Date
Amount
10/14/68
$ 137,689.00
12/1/69
48,375.00
10/29/70
47,500.00
7/19/71
42,500.00
2/24/72
48,250.00
7/7/72
48,100.00
9/27/72
107,777.00
11/13/72
12,967.58
Total
$ 493,158.58
4. The specific documents stipulated to were: (1) An exhibit entitled "Sentencing Memorandum of the United States of America." This document was prepared by the U.S. Attorney's Office in the SDNY in connection with United States v. Robert P. Beasley, 77 Cr. 768. (2) An exhibit entitled "The Firestone Tire & Rubber Company Questionable Cash Transactions, November 29, 1961 - July 18, 1973", dated March 22, 1977. This document was prepared internally by Firestone. (3) An exhibit entitled "Beasley Memorandum of Sentencing." This document was prepared by petitioner's attorney in connection with 77 Cr. 768. (4) An exhibit entitled "Supplementary Sentencing Memorandum of the United States of America." This document was prepared by the U.S. Attorney's Office in the SDNY in connection with 77 Cr. 768. (5) An exhibit representing the transcript of petitioner's guilty plea hearing in 77 Cr. 768, presided over by Hon. Milton Pollack, dated February 27, 1978, together with exhibits attached thereto. (6) A copy of petitioner's indictment in 77 Cr. 768 by a Grand Jury impaneled in the SDNY, except that page two of such indictment was missing. (7) An analysis with supporting exhibits detailing the total amounts paid by petitioner back to Firestone, in settlement of The Firestone Tire and Rubber Company v. Robert P. Beasley, Case No. 77-2-0514 and Robert P. Beasley v. R. A. Riley, et al., Case No. CV 77-12-2947, brought in the Common Pleas Court of Summit County, Ohio. (8) An exhibit entitled "Report of the Findings and Determinations Made By The Audit Committee of the Board of Directors of the Firestone Tire & Rubber Company Concerning Corporate Political Contributions and Certain Other Matters", dated December 20, 1976. (9) An exhibit entitled "Final Report Issued by the Audit Committee of the Board of Directors of the Firestone Tire & Rubber Company To Complete Its Special Investigation", dated October 31, 1979.↩
5. Pursuant to Rule 81(d) and upon stipulation of the parties, a deposition in lieu of trial testimony was taken of Mr. Eaton. For whatever reason, petitioner's counsel chose not to examine Mr. Eaton.↩
6. Testimony by approximately 150 persons was obtained by, or introduced to, the Cleveland Grand Jury. Transcripts of that testimony have been disclosed to the parties pursuant to a Fed. R. Crim. Proc. 6(e) order. The parties stipulated that 63 Cleveland Grand Jury transcripts met the criteria for admissability under Fed. R. Evid. 803(24)↩. The parties stipulated further that (1) such testimony be treated as the live testimony of the grand jury witnesses; (2) each party reserved the right to make any evidentiary objections in their post-trial briefs; and (3) the parties may file an optional reply brief solely to rebut transcript portions relied upon for the first time in the opposition's answering brief. Respondent filed a reply brief, but petitioner opted not to. The testimony of Mr. King was raised in respondent's answering brief, and no evidentiary objection was raised by petitioner.
7. We note, however, that petitioner and counsel did not admit using the Phoenix AG and Harvey Firestone funds for personal purposes. ↩
8. We shall subtract $ 12,167 from the 1972 unreported income of $ 113,286, to result in net unreported income in 1972 of $ 101,119. Since payments exceeded receipts in 1973, the payments were necessarily funded by pre-1973 diverted funds. Accordingly, we reduce unreported income in 1972 by the excess of payments over receipts experienced in 1973.↩
9. Respondent argued at trial and on brief that petitioner is estopped to deny any fact which supports an element of the criminal offenses to which petitioner pled guilty. However, on the facts of this case, we need not reach this issue, since without applying the collateral estoppel doctrine we find fraud on the part of petitioner.↩
1. Transposition in original. This amount should be $ 2,721,160.74.↩
*. Directly traced into petitioner's off-book accounts by Agent Lang (Total: $ 539,212). + Treasury Voucher transactions charged to Firestone MO account No. 98-9749.↩